**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**
**PITTSBURGH DIVISON**

| | | |
|---|---|---|
| SHADY SIDE ACADEMY and JONNA BURKE, | : | Civil Action No. |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| PENNSYLVANIA INTERSCHOLASTIC ATHLETIC ASSOCIATION, INC., | : | |
| | : | |
| Defendant. | : | **JURY TRIAL DEMANDED** |
| | : | |

## COMPLAINT

Plaintiffs Shady Side Academy ("SSA"), and Jonna Burke ("Coach Burke"), by and through its undersigned attorneys, files the within Complaint against Defendant Pennsylvania Interscholastic Athletic Association, Inc. ("PIAA"), stating as follows:

## I.    PARTIES

1.      Plaintiff, Shady Side Academy, is a private school with a business address of 423 Fox Chapel Road, Pittsburgh, Pennsylvania, 15238, and is a member of the Western Pennsylvania Interscholastic Association League ("WPIAL") and the Pennsylvania Interscholastic Athletic Association, Inc. ("PIAA").

2.      Plaintiff, Jonna Burke, is an adult individual, residing at 448 Bassett Drive, Bethel Park, Pennsylvania, 15102.

3.      Defendant, Pennsylvania Interscholastic Athletic Association, Inc., is a Pennsylvania non-profit corporation with a principal business address of 550 Gettysburg Road, P.O. Box 2008, Mechanicsburg, Pennsylvania, 17055-0708.  The Defendant is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania.  The PIAA consists of twelve (12) geographic districts, including, the Western Pennsylvania Interscholastic Athletic

1

League, ("WPIAL"). Each geographic district maintains a district committee elected by its member schools within the district.

4.      Shady Side Academy is a member school of the PIAA and WPIAL.

## II.      JURISDICTION AND VENUE

5.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, Federal Question Jurisdiction, as this civil action arises under the Constitution and laws of the United States.

6.      This Court may exercise supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

7.      The instant cause of action accrued and the events and injuries giving rise to the claim occurred within the Western District of Pennsylvania (Allegheny County) and because the Defendant is a non-profit corporation which is deemed to reside in this District. Accordingly, venue over this cause of action properly lies within the District Court for the Western District of Pennsylvania pursuant to 28 U.S.C. § 1391.

## III.      STATEMENT OF FACTS

### A.      Shady Side Academy and Coach Jonna Burke

8.      Shady Side Academy is a private school for students grades Pre-K through 12. As part of its high school athletic program, SSA has a girls' basketball team that permits SSA students from grades 9-12 to participate.

9.      On or about September 2021, SSA hired Coach Jonna Burke to serve in the role of Head Coach of the SSA high school Girls' Basketball program. Coach Burke maintains a written agreement with SSA relative to her position as the head coach for the Girls' Basketball program. Coach Burke's agreement provides her with compensation on a season basis and allows for termination upon a showing of "just cause". (*See*, Employment Contract for the 2023-2024

Season, attached hereto as **Exhibit 1**, and Employment Contract for the 2022-2023 Season, attached hereto as **Exhibit 2**).

10.     Prior to accepting the position of Head Coach of SSA Girls' Basketball team, Coach Burke was the head basketball coach for the Bethel Park High School Girls' Basketball team for eighteen (18) years, and for eight (8) years prior, she served as the Girls' Basketball coach at Butler Area High School.

11.     In the past season of coaching at SSA, Coach Burke guided her team to a 25-4 record.  In her total twenty-eight (28) seasons of coaching, Coach Burke amassed a record of 518-212.  (*See*, Pittsburgh Union Progress and Pittsburgh Tribune-Review articles, attached hereto as **Exhibit 3** and **Exhibit 4**).  Coach Burke has a stellar record and has never been accused of running afoul of any PIAA rules or regulations.

**B.     PIAA Rules and Regulations**

12.     The PIAA, by and through its Constitution, Bylaws, Rules and Regulations and Policies and Procedures, governs the conduct of interscholastic athletic competition by and between PIAA member schools, including public, Catholic and private schools throughout the Commonwealth of Pennsylvania.

13.     A large majority of public, Catholic and private schools in Pennsylvania are members of the PIAA.

14.     A PIAA district (like the WPIAL) is an entity consisting of one or more counties. Each established district is responsible for administering PIAA interscholastic athletics within its jurisdiction.

15.     A district committee is responsible for administering the interscholastic athletic rules within a PIAA district, including rules enforcement and disciplinary actions.

16.     The district committee (such as the WPIAL district committee) is empowered, "[t]o address alleged violations of the Constitution, Bylaws, Policies and Procedures, and Rules and Regulations of PIAA" and "[t]o fix and enforce penalties, within the District," … for such violations… "within the limits prescribed by the Bylaws." (S*ee*, PIAA Constitution and Bylaws, Article IX, § 3(G) and (H), pg. 6, attached hereto at **Exhibit 5**).

17.     The PIAA Board of Directors is the administrative and executive body of the PIAA and has the power, "[t]o investigate, request, receive and/or otherwise obtain information (written and/or oral), hear and decide appeals from decisions of … District Boards." (*See*, **Ex. 5**, Art. VII, § 1(H), at pg. 4).

18.     Appeals from district committees, like the WPIAL, are heard by a Board of Appeal, which is comprised of at least five (5) members of the PIAA Board of Directors. (S*ee*, **Ex. 5**, Art. VII, § 1(J), at pg. 4).

19.     "Where a transcript has been made of the proceedings before the Regional Panel or District Board, the record on appeal shall be limited to that transcript and any written materials that were before the Regional Panel or District Board in connection with the making of its decision." (*See*, PIAA Policies and Procedures, Procedural Standards, V(C), pg. 29, attached hereto at **Exhibit 6**).

20.     "Where there is a transcript of the proceedings before the … District Board, and the record on appeal is therefore limited to the testimony and papers before the … District Board … The hearing shall be limited, however, to argument based upon the record previously submitted." (*See*, **Ex. 6**, Procedural Standards, VI(A)(4)(a), at pg. 29).

21.     Article VI, Section 9 "Recruiting", of the PIAA Constitution and Bylaws in relevant part states: "Recruiting which is materially motivated in some way by an athletic purpose is defined

as efforts by a school, or any of its employees, agents, or representatives, to engage in, support, or condone conduct whereby a motivating factor is to seek out one or more athletes to attend a particular school...".  (*See*, **Ex. 5**, Art. VI, § 9, at pg. 22).

22.     Under Article VI, Section 9(D), coaches are prohibited from engaging in "recruiting" as defined by the Bylaws and are subject to disqualification for at least one (1) year if recruiting occurs.  (*See*, **Ex. 5**, Art. VI, § 9(D), at pg. 23).

23.     Within the PIAA Constitution and Bylaws regarding recruiting, the rules also provide for an exception to the "Recruiting" definition.  Article VI, Section 9(B)(9) (NOTE) provides: "This restriction does not prohibit school personnel from responding to purely student - or student family - initiated inquiries to the personnel about athletic programs at the school."  (*See*, **Ex. 5**, Art. VI, § 9(B)(9) at pg. 22).

24.     The PIAA Constitution and Bylaws do not contain any rules regarding what constitutes recruiting in the context of social media nor does it identify what is considered a violation of the PIAA recruiting rules in a social media context.

25.     Similarly, the PIAA Constitution and Bylaws fail to define in its recruiting rules what an "initiating inquiry" or response is at all or what one is in a social media context.

**C.     WPIAL and Shady Side Academy**

26.     The Western Pennsylvania Interscholastic Athletic League ("WPIAL") represents the PIAA's District VII, covering participating schools generally within the Western Pennsylvania geographic region.

27.     Shady Side Academy is a member private school of PIAA District VII.

28.     The District VII WPIAL Committee oversees and enforces the PIAA Constitution and Bylaws within its District.

29.     At all times relevant hereto, Mr. Scott Seltzer was the Executive Director of the WPIAL Committee.

30.     At all times relevant hereto, Mr. Michael Allison was the Treasurer of the WPIAL and served as the Presiding Officer of the WPIAL Committee Hearing regarding Coach Burke.

31.     At all times relevant hereto, Dr. Robert A. Lombardi was the PIAA's Executive Director, who oversaw the PIAA Board of Appeal Hearing regarding Coach Burke's suspension.

**D.     Twitter Inquiry to Coach Burke**

32.     Upon information and belief, Brian and Sarah Vierra are the parents of a student who attends South Fayette Township School District.  At the time of the alleged incident (discussed below), the Vierra's child was a rising eighth grade student.

33.     Upon information and belief, the Vierras' daughter plays basketball for various teams, including an Amateur Athletic Union (AAU) team.

34.     Prior to June 13, 2023, Brian and Sarah Vierra each individually and deliberately searched the social media site "Twitter" to seek out Coach Jonna Burke's personal account, which is separate from the Twitter accounts maintained for Shady Side Academy, Shady Side Academy Athletics, and the Shady Side Academy Girls' Basketball.  In other words, the Vierras sought out Coach Burke personally on Twitter rather than Shady Side Academy's Twitter accounts.

35.     Coach Burke's personal Twitter account identifies her as the Head Coach of Shady Side Academy Girls' Basketball team and uses the Shady Side Academy school mascot as a picture on her profile.  (*See*, August 3, 2023, WPIAL Appeal Letter, at **Exhibit 7**, which includes the WPIAL Hearing Transcript ("WHT") at Exhibit 1; Pg. 16, Lines 14-25; Pg. 17, Lines 1-10 and WHT Ex. 3).

36.     Mr. Vierra intentionally and deliberately viewed Coach Burke's Twitter page and, upon viewing, elected to interact with Coach Burke by clicking the button "Follow" Coach Burke

on Twitter thereby initiating contact with her.  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 18, Lines 5-25; Pg. 19, Lines 1-25; Pg. 20, Lines 1-3; and WHT Ex. 4-5).

37.     On the same day, prior to June 13, 2023, Ms. Vierra, independent of her husband, also searched Twitter to specifically find and view Coach Burke's personal account.  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 18, Lines 5-25; Pg. 19, Lines 1-25; Pg. 20, Lines 1-3; and WHT Ex. 4-5).

38.     Thereafter, Ms. Vierra, independent of Mr. Vierra, intentionally and deliberately clicked the button on Coach Burke's Twitter page to "Follow" Coach Burke's personal page, thereby initiating contact with her.  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 18, Lines 5-25; Pg. 19, Lines 1-25; Pg. 20, Lines 1-3; and WHT Ex. 4-5).

39.     The Vierras' actions, each individually "Following" Coach Burke on Twitter via her personal Twitter page, caused Coach Burke to receive two (2) different notifications that two (2) new people unknown to her had initiated contact with her by "Following" her on Twitter. (*See*, **Ex. 7**, WHT Ex. 1; Pg. 17, Lines 16-25).

40.     In the evening on the same day that both the Vierras contacted Coach Burke, an icon appeared on Coach Burke's Twitter page, alerting her that two (2) new people had contacted her.  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 17, Lines 16-25).

41.     The Vierras' actions of each parent independently contacting Coach Burke on her personal Twitter page caused the content of both of the Vierras' Twitter pages to be accessible for Coach Burke to view.  (*See* **Ex. 7**, WHT Ex. 1; Pg. 40, Lines 20-25; Pg. 41, Lines 1-9).

42.     Both of the Vierras' Twitter pages invited review and made available content to Coach Burke of the Vierras' videos and highlight reels of their daughter playing basketball for her AAU basketball team. (*See* **Ex. 7**, WHT Ex. 1; Pg. 40, Lines 20-25; Pg. 41, Lines 1-9).

43.     Not recognizing the Vierras' name nor knowing who either Brian or Sarah Vierra were, Coach Burke viewed the content of both of their Twitter pages which they made available to her to determine who they were and why these two people, unknown to her, independently contacted her as they were not friends or acquaintances of hers.  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 23, Lines 11-13; Pg. 23, Lines 14-19; Pg. 24, Lines 3-5; Pg. 25, Lines 18-21).

44.     "But for" the Vierras contacting Coach Burke's personal Twitter account, Coach Burke had no prior knowledge of or connections or contact with the Vierras and would have had no interactions with them.  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 19, Lines 13-16; Pg. 23, Lines 14-19; Pg. 24, Lines 3-5; Pg. 25, Lines 18-21; Pg. 40, Lines 20-25; Pg. 41, Lines 1-9; Pg. 42, Lines 22-25; Pg. 43, Lines 1-9).

45.     Due to the fact that both parents, Brian and Sarah Vierra each independently contacted Coach Burke via her personal Twitter account (that identifies her as the Head Coach of Shady Side Academy Girls' Basketball team), with the understanding that their contact would result in a notification to Coach Burke of their desire to contact her, each parent independently and deliberately shared videos of their daughter playing basketball with her, Coach Burke reasonably interpreted the Vierras' actions as expressing an interest in their daughter, a rising eighth grade student, attending Shady Side Academy.  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 20, Lines 14-24).

46.     Since both the Vierras initiated contact with Coach Burke via her personal Twitter account and inherently expressed interest in Shady Side Academy, Coach Burke briefly responded to the Vierra parents' initiating inquiry by advising them if they had any interest in Shady Side Academy, she would be willing to speak with them and complimented their daughter's basketball skills.  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 21, Lines 12-25; Pg. 22, Lines 1-7).

47.     Since Coach Burke's short response to the Vierras' initial contact, there has been no further communication between the Vierras and Coach Burke.  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 42, Lines 22-25; Pg. 43, Lines 1-9).

**E.     Undisclosed Complaint Against Coach Burke**

48.     On or about June 13, 2023, Scott Seltzer on behalf of the WPIAL, sent an email to Trixie Sabundayo, SSA's Head of School, and Sean Simmons, SSA's Athletic Director.  The email indicated that the WPIAL received a complaint from an unidentified member school that Coach Burke sent a message to Brian and Sarah Vierra regarding their daughter who, at the time, was a rising eighth grader in the South Fayette Township School District (the "Compladant").  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 46, Lines 16-25, Pg. 47, Lines 1-4; and WHT Ex. 7).  Mr. Seltzer, acting on behalf of the WPIAL, failed to attach the Complaint described in his email.  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 47, Lines 12-16; and WHT Ex. 12).

49.     The PIAA Policies and Procedures, Appeal Procedures, V(D) provide: "Where the matter arises on the written complaint of member school, the notice letter to the accused school **shall** include a copy of the written complaint and any other written materials submitted by the complaining school." (emphasis added).  (*See*, **Ex. 6**, Procedural Standards, V(D), at pg. 21).

50.     Mr. Seltzer advised that the Complaint was "filed" with the WPIAL Committee against Coach Burke.  Although WPIAL and the PIAA failed to supply Coach Burke with a copy of the Complaint, Mr. Seltzer requested that SSA respond to the allegations raised against Coach Burke.  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 47, Lines 23-25; Pg. 48, Line 1).

51.     In response to the WPIAL Committee's request, and without the benefit of having a copy of the Complaint "filed" by the unnamed member school against Coach Burke, Mr. Simmons (SSA Athletic Director) conducted an investigation surrounding an alleged message sent

by Coach Burke to the Vierras.  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 48, Lines 2-21; Pg. 49, Lines 6-9; and WHT Ex. 8).

52.     As a result of the investigation, Mr. Simmons concluded that Coach Burke's message was made in response to an initial inquiry made by the Vierras regarding SSA, given that: (1) the Vierra parents sought out Coach Burke's personal Twitter account that identifies her as the Coach of the Shady Side Girls' Basketball team; (2) each individually and independently initiated an inquiry to Coach Burke by each deliberately contacting Coach Burke personally via Twitter; (3) Coach Burke did not know who these people were before they contacted her and thus Coach Burke could not have sought out the Vierras for purposes of recruiting; (4) the Vierra parents showed Coach Burke videos of their daughter playing basketball, demonstrating their interest in having their daughter attend Shady Side Academy and play basketball there; (5) Coach Burke's response to the Vierras was not athletically motivated; and (6) Coach Burke's message was sent in response to the Vierra's initial inquiry made by the Vierras regarding Shady Side Academy. (*See*, **Ex. 7**, WHT Ex. 1; Pg. 52, Lines 4-25; Pg. 53, Lines 1-25; Pg. 54, Lines 1-25; Pg. 55, Lines 1-6).  Based upon the exception to the PIAA's recruiting rules (Article VI, Section 9(B)(9)(NOTE)) that permits a coach to respond to a family member who initiates an inquiry, Mr. Simmons found that Coach Burke did not violate any PIAA rules regarding recruiting.  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 48, Lines 22-25; Pg. 49, Lines 1-5; *see also*, **Ex. 5**).

53.     However, because SSA's internal policies provide that Coach Burke's response to the family should have directed the Vierras to contact the SSA office for admission, Mr. Simmons found that Coach Burke violated SSA's policy and imposed a punishment on Coach Burke consistent with that infraction.  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 49, Line 25; Pg. 50, Lines 1-19).  As

a result of his investigation, Mr. Simmons definitively found that Coach Burke did not violate any PIAA recruiting rules.  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 48, Lines 22-25; Pg. 49, Lines 1-5).

54.     On or about June 20, 2023, Mr. Simmons (SSA) emailed Mr. Seltzer (WPIAL) with the results of his investigation regarding the alleged recruiting by Coach Burke.  In that email, Mr. Simmons advised that his investigation found that Coach Burke was responding to the Vierras' initiating inquiry to her.  Mr. Simmons never advised the WPIAL Committee that he found Coach Burke to be in violation of the PIAA Constitution and Bylaws and any recruiting rule contained therein.  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 49, Lines 10-25, Pg. 50, Lines 1-24; and WHT Ex. 8).

**F.      WPIAL Hearing**

55.     On or about July 10, 2023, Mr. Seltzer, on behalf of the WPIAL, sent a Notice of Hearing letter to SSA setting a hearing for Thursday, July 20, 2023 at 1:30 p.m. in the WPIAL office regarding allegations of recruiting by a still unnamed member school against Coach Burke. In doing so, the WPIAL provided SSA and Coach Burke with only 10 days' notice of the scheduled Hearing.  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 55, Lines 19-25; Pg. 56, Lines 1-11; Pg. 58, Lines 6-25; Pg. 59, Line 1; and WHT Ex. 10).

56.     PIAA Policies and Procedures, Procedural Standards, V(C) provides in pertinent part: "Where possible, the notice letter should be mailed, e-mailed, or faxed under circumstances that would result in its being received by the Principal at least two weeks before the hearing." (*See*, **Ex. 6**, Procedural Standards, V(C), at pg. 21).

57.     Further, PIAA Policies and Procedures, V(D) requires:  "Where the matter arises on the written complaint of member school, the notice letter to the accused school shall include a copy of the written complaint and any other written materials submitted by the complaining school." (*See*, **Ex. 6**, Procedural Standards, V(D), at pg. 21).

58.     The WPIAL, acting through Mr. Seltzer, again failed to attach the Complaint to the Notice of Hearing that had allegedly been "filed" with the WPIAL Committee members in violation of PIAA Policies and Procedures V(D).  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 57, Lines 6-25; Pg. 58, Lines 1-5; and WHT Ex. 10 and 12).

59.     Following receipt of the Notice of Hearing, SSA and Coach Burke (through their counsel) requested in a letter dated July 13, 2023, that the WPIAL, "provide the name(s) of any WPIAL Committee members, or other members who held a position with the WPIAL, that consulted with the unnamed PIAA/WPIAL member school before, or after, any complaint was filed and the content of those conversations or written exchanges".  Such information was necessary to allow SSA and Coach Burke to determine if they should request the recusal of any Committee members from participating in the scheduled hearing against Coach Burke.  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 1, Lines 21-25; Pg. 2, Lines 1-25; Pg. 6, Lines 8-25; Pg. 7, Lines 1-8; and WHT Ex. 1).

60.     Three (3) days prior to the hearing, WPIAL (through its counsel) advised that two (2) Committee members, Mr. Brian Geyer and Mr. Jason Olexa, were recused from sitting on the hearing panel presumably because both had consulted with the unnamed PIAA/WPIAL member school either before or after it filed the Complaint against Coach Burke.  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 7, Lines 9-25; Pg. 8, Lines 1-25; Pg. 9, Lines 1-10; and WHT Ex. 2).  No further information about the content of their conversations or written exchanges were provided as requested.

61.     Minutes prior to the start of the July 20, 2023 hearing, Mr. Scott Seltzer, acting on behalf of the WPIAL Committee, provided SSA and Coach Burke with a copy of the "filed" Complaint for the first time.  The Complaint was received by WPIAL more than a month prior on June 13, 2023 and was the impetus for the hearing against Coach Burke that day.

62.     Despite just being served with the "filed" Complaint that formed the basis for the hearing, and over objections from counsel for SSA and Coach Burke, the WPIAL Committee commenced the hearing against Coach Burke.  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 9, Lines 12-25; Pg. 10, Lines 1-25; Pg. 11, Lines 1-10).

63.     To start the hearing, the WPIAL Committee, through its attorney, advised that the complaining school, South Fayette, was not going to put on its case or present any evidence against Coach Burke, but rather Coach Burke was required to defend herself against unspecified allegations against her surrounding her response to the Vierra parents' initial inquiry.  (*See*, **Ex. 7**, WHT Ex. 1; Page 9, Lines 12-25; Page 10, Lines 1-25; Page 11, Lines 1-25; Page 12, Lines 1-25).

64.     Coach Burke and SSA objected to the WPIAL refusing to follow its own mandatory rules by **not** requiring South Fayette to present its allegations and evidence against Coach Burke before Coach Burke was required to presented her defense.  (*See*, **Ex. 7**, WHT Ex. 1; Page 9, Lines 12-25; Page 10, Lines 1-25; Page 11, Lines 1-25; Page 12, Lines 1-25).

65.     Coach Burke and SSA referred the WPIAL Committee to the PIAA Policies and Procedures, Procedural Standards, VI(E)(1) which states: "Where the matter arose on the complaint of a member school, the representatives of that school **shall** be requested to make the first presentation." (emphasis added) (*See*, **Ex. 6**, Procedural Standards, VI(E)(1), at pg. 23).

66.     Coach Burke and SSA explained that the PIAA rules required the WPIAL to have the complaining school present its case against Coach Burke first to allow Coach Burke and the SSA to fully understand the accusations made against her.  Coach Burke and SSA explained to the Committee that its failure to do so would be a flagrant violation of Coach Burke's due process rights to a full, fair and impartial hearing.  (*See*, **Ex. 7**, WHT Ex. 1; Page 9, Lines 12-25; Page 10, Lines 1-25; Page 11, Lines 1-25; Page 12, Lines 1-25).

67.     In response, the WPIAL Committee failed to acknowledge its own rules and Coach Burke's due process rights and indicated it only wanted to hear an explanation from the Coach. The WPIAL Committee would not require South Fayette, the complainant, to present its case first or present *any case at all against Coach Burke* as the rules required.  (*See*, **Ex. 7**, WHT Ex. 1; Page 9, Lines 12-25; Page 10, Lines 1-25; Page 11, Lines 1-25; Page 12, Lines 1-25).  Coach Burke had no opportunity to hear the case against her or to cross-examine any witnesses.

68.     The WPIAL Committee's failure to follow its mandatory rules in requiring the complainant to present its case against Coach Burke denied her the ability to conduct cross-examination to place the witness(es) in his/her proper setting and put the weight of his/her testimony and his/her credibility to a test without which the WPIAL Committee could not properly appraise them.

69.     In failing to follow its own rules, the WPIAL Committee wrongfully placed the burden of proof on Coach Burke and/or found that South Fayette met its initial burden taking evidence outside of the hearing or without taking any evidence at all.

70.     Despite the rules that required the complainant to make first presentation and carrying the initial burden of proof, the WPIAL Committee wrongfully transferred the burden of proof onto Coach Burke or found the burden had been met without any evidence despite its purported role of acting as an independent tribunal.  The WPIAL Committee by Pennsylvania statute, has the ultimate burden of proof.  24 P.S. §16-1604-A(b)(12)(ii).

71.     24 P.S. §16-1604-A(b)(12)(ii) provides:  "[a]ny and all procedures established to gather evidence related to the enforcement of such rules shall place the burden of proof of the breach of such rules on the association and shall afford any member school entity due process

rights in defending itself against the allegations, including a right to a hearing on the charges before the imposition of penalties."

72.     The hearing proceeded with testimony from Coach Burke and SSA Athletic Director Mr. Simmons.  Both testified that Coach Burke's message to the Vierras was done in response to the parents' initial contact with her via Twitter.  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 20, Lines 14-25; Pg. 21, Lines 1-20; Pg. 54, Lines 3-12).  All of the testimony provided by Coach Burke and Mr. Simmons was unrefuted in that no contrary evidence was ever presented to or reviewed by the WPIAL Committee.

73.     Coach Burke testified that she did not know who the Vierras were prior to them contacting her via Twitter and thus could not have, and in fact did not, seek them out for recruiting purposes.  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 18, Lines 9-12; Pg. 18, Lines 20-25; Pg. 19, Lines 1-16; Pg. 23, Lines 14-25; Pg. 24, Lines 1-5; Pg. 25, Lines 18-21; Pg. 28, Lines 12-18; Pg. 40, Lines 20-25; Pg. 41, Lines 1-9).

74.     Moreover, Coach Burke testified that her message to the Vierras was in response to both Vierra parents contacting her separately on the same day, providing to Coach Burke videos of their daughter playing basketball.  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 19, Lines 17-25; Pg. 20, Lines 1-24; Pg. 21, Lines 12-25; Pg. 22, Lines 1-16).  To reciprocate courtesies, she offered the Vierras' daughter a compliment and advised if they were interested in SSA she would be willing to speak with them.  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 21, Lines 21-25; Pg. 22, Lines 1-7; Pg. 39, Lines 24-25; Pg. 40, Lines 1-8.).

75.     Coach Burke testified that there was no intent to recruit the Vierras' daughter as she did not know who they were until they contacted her, and would and could not have responded to the Vierra parents and seen their daughter's basketball videos "but for" the Vierra parents

initiating contact with her through Twitter.  As such, Coach Burke's actions lacked any intent to recruit the Vierras' daughter.  Coach Burke did not seek out the Vierras out of the millions Twitter users at any time.  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 28, Lines 12-18; Pg. 18, Lines 9-12; Pg. 18, Lines 20-25; Pg. 19, Lines 1-16; Pg. 23, Lines 14-25; Pg. 24, Lines 1-5; Pg. 25, Lines 18-21; Pg. 22, Lines 17-25; Pg. 23, Lines 1-4; Pg. 40, Lines 20-25; Pg. 41, Lines 1-9).  This testimony submitted to the WPIAL Committee was unrefuted.

76.     Finally, Coach Burke testified that the Vierras sought her out, found her personal Twitter page that identified her as the Head Coach of Shady Side Academy Girls' Basketball team, and made available videos of their daughter playing basketball.  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 18, Lines 5-25; Pg. 19, Lines 1-25; Pg. 20, Lines 1-3; Pg. 16, Lines 14-25; Pg. 17, Lines 1-10; Pg. 40, Lines 20-25; Pg. 41, Lines 1-9; and WHT Ex. 3-5).

77.     All of Coach Burke's testimony was unrefuted by any other evidence presented to the WPIAL Committee at the hearing.  By PIAA Policies and Procedures, the Committee was limited to making its decision based solely on the evidence.  ("The decision shall be based only on the evidence, written and oral, presented."  (*See*, **Ex. 6**, Procedural Standards, VII(C), at pg. 26)).

78.     Brian and Sarah Vierra were present at the hearing via Zoom.  Each were questioned by WPIAL Committee members.  Neither parent refuted Coach Burke's testimony as it related to the purpose of the parents' initial contacts with Coach Burke.  They did not refute that they searched Twitter to find Coach Burke's personal Twitter page, deliberately initiated contact with her by following her and provided her with videos of their daughter playing basketball.  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 42, Lines 13-25; Pg. 43, Lines 1-11).

79.     Thereafter, SSA Athletic Director, Mr. Simmons, testified that SSA never received the Complaint "filed" against Coach Burke either through WPIAL's initial email contact or the

Notice of Hearing.  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 47, Lines 5-16; Pg. 55, Lines 19-25; Pg. 56, Lines 1-15; Pg. 57, Lines 6-25; Pg. 58, Lines 1-5; and WHT Ex. 12).  Mr. Simmons also testified that SSA and Coach Burke only received notice of the Hearing ten (10) days prior to the actual Hearing date.  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 58, Lines 6-25; Pg. 59, Line 1; and WHT Ex. 10).  Again, this testimony by Mr. Simmons was unrefuted by any evidence submitted to the WPIAL Committee upon which to base its decision.

80.     Mr. Simmons went on to testify that he conducted an investigation into the circumstances surrounding the message Coach Burke sent.  He found that Coach Burke responded to an initial inquiry by the Vierras and did not seek out the Vierras for recruiting purposes.  Mr. Simmons also testified that Coach Burke could not have initiated contact with the Vierras because prior to the Vierras contacting Coach Burke, she did not know who they were.  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 52, Lines 4-25; Pg. 53, Lines 1-25; Pg. 54, Lines 1-25; Pg. 55, Lines 1-6).  Additionally, Mr. Simmons testified that Coach Burke's response to the Vierras' initial inquiry was not motivated by athletic intent and thus was not recruiting.  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 63, Lines 19-25; Pg. 64, Lines 1-10).  Based on these gathered facts, Mr. Simmons testified that Coach Burke did not violate any PIAA recruiting rules.  Mr. Simmon's testimony was unrefuted by any other evidence.

81.     Mr. Simmons also testified that although Coach Burke's actions did not violate the PIAA rules, her response did violate Shady Side Academy's policies.  As a result, Mr. Simmons testified that SSA imposed punishment on Coach Burke for violating its policies.  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 54, Lines 13-25; Pg. 55, Lines 1-18).

82.     The complaining school, South Fayette, had its Athletic Director present at the hearing.  Despite being present, South Fayette never presented a case against Coach Burke

outlining its allegations and any evidence against her nor did it present any evidence to refute the evidence and testimony submitted by SSA and Coach Burke, resulting in the WPIAL Committee eliminating South Fayette's initial burden of proof obligation and transferring without rule or basis the burden of proof to Coach Burke.  Further, South Fayette never introduced into evidence the "filed" Complaint with the WPIAL against Coach Burke.  The WPIAL Committee failed to recognize that it had the ultimate burden of proof.  SSA and Coach Burke had no burden of proof.

83.     On or about July 20, 2023, Mr. Scott Seltzer, on behalf of the voting WPIAL members, verbally advised Mr. Simmons shortly after the hearing concluded at 3:04 p.m. that the WPIAL decided to suspend Coach Burke for one (1) year for violating the PIAA recruiting rules.

84.     Approximately one (1) hour after the hearing concluded at 4:22 p.m., Mr. Seltzer, on behalf of WPIAL, forwarded to Mr. Simmons and Ms. Sabundayo the WPIAL Committee's written decision to suspend Coach Burke.

85.     Mr. Seltzer, on behalf of the WPIAL Committee, commented to the Pittsburgh Tribune Review that "the Board voted unanimously to suspend Burke… '[t]he Board found there was a violation.'"  (*See*, **Ex. 4**).

86.     Similarly, Mr. Seltzer, on behalf of the WPIAL Committee, also commented to the Pittsburgh Union Progress wherein he stated "…the Board voted unanimously to suspend Burke…"  (*See*, **Ex. 3**).

87.     The WPIAL Committee, through Mr. Seltzer, made these comments to various newspapers thereby tarnishing, harming and damaging the otherwise stellar reputation of Coach Burke, which she has cultivated for almost thirty (30) years.  In the high school basketball universe, Coach Burke has been revered as one of the best all-time coaches.  For example, in the Pittsburgh Union Progress, Coach Burke is referenced to as "[o]ne of the most esteemed and well respected

coaches in the WPIAL." (*See*, **Ex. 3**). "Burke is a highly successful coach who has more than 500 career wins." (*See*, Pittsburgh Post-Gazette article, attached hereto as **Exhibit 8**). Still further, "…Shady Side Academy girls basketball coach Jonna Burke, a 500 game winner who ranks among the league's most accomplished active coaches." (*See*, Pittsburgh Tribune-Review article, attached hereto as **Exhibit 9**). "With more than 500 career wins in 28 seasons, Burke is one of the most successful active girls basketball coaches in the WPIAL." (*See*, Pittsburgh Tribune-Review article, attached hereto as **Exhibit 10**).

88.     The Pittsburgh Post-Gazette went so far as to remark that "… Coach Burke, who has coached – and by extension mentored, taught and helped – hundreds of girls throughout her nearly 30-year career.  She is precisely the kind of person we WANT coaching our kids, exactly the type of person who is in it for the right reasons, and now the hypocrites in stuffed suits will make her sit out a year?" (*See*, Pittsburgh Post-Gazette article, attached hereto at **Exhibit 11**).

89.     Thereafter, on July 26, 2023, the WPIAL Committee sent to Ms. Sabundayo a supplemental letter outlining its decision which is without any evidentiary bases and stands in direct contradiction to the only evidence presented at Coach Burke's hearing.  (*See*, Ex. 9 of the PIAA Appeal Letter, at **Ex. 7**).

### G.     Appeal to the PIAA Board of Directors

90.     On or about July 24, 2023, SSA, on behalf of Coach Burke, requested via email an appeal of the WPIAL Committee's decision to suspend Coach Burke to the PIAA Board of Directors and its Executive Director, Dr. Robert Lombardi.  (*See*, email correspondence, attached hereto as **Exhibit 12**).

91.     On August 3, 2023, SSA and Coach Burke, through their counsel, submitted a formal written appeal, attaching the transcript from the WPIAL Hearing along with the written evidence submitted to the WPIAL Committee.  (*See*, **Ex. 7**).

92.     Dr. Lombardi, on behalf of the PIAA, scheduled a hearing on the appeal for August 22, 2023.  (*See*, August 10, 2023 email correspondence, attached hereto as **Exhibit 13**).

93.     On August 22, 2023, the PIAA Board heard oral argument from counsel for SSA and Coach Burke.  The Athletic Director for South Fayette also attended the hearing and chose only to make a brief opening statement.  No new evidence or testimony was permitted to be presented, nor presented, given that a transcript of the WPIAL Hearing was made and submitted to the PIAA.  (*See*, **Ex. 6**, Appeal Procedures, V(C) and VI(4)(a), pg. 29).

94.     Hours after the conclusion of the PIAA Hearing, Dr. Lombardi contacted Mr. Simmons and verbally informed him that the PIAA Board had decided to uphold Coach Burke's suspension without any further explanation, other than a decisional letter that would be forthcoming.

95.     Later that same day, without any decisional letter being sent to SSA or Coach Burke, Dr. Lombardi commented to the Pittsburgh Tribune Review/TribLive news organization that Coach Burke raised, "an interesting argument".  Dr. Lombardi also commented that, "[t]he board addressed it (in deliberations).  They feel there's a spirit and intent to every rule that we have.  I'm not sure they agree with the interpretation of a 'follower' being an inquiry."  (*See*, **Ex. 10**).

96.     In a separate news article, Dr. Lombardi told the Pittsburgh Post-Gazette that, "[t]he board felt this was a form of recruiting".  He stated: "There was discussion that was brought forward about: Is a follower [on Twitter] an inquiry?  The board had to have a discussion about that and weigh the merits of the arguments.  **But she answered the parents.  That was pretty clear...** In cases like this, there are always 50% of people on one side and 50% on the other.  But

our membership has said they want these type of rules [on recruiting].   They voted on them, enacted them, and we enforce them...".   (emphasis added).   (*See*, **Ex. 8**).

### H.   PIAA Decisional Letter

97.   Having still not received a written decisional letter from the PIAA regarding its Appeal, Mr. Simmons contacted Dr. Lombardi on September 11, 2023, to inquire when it was that SSA and Coach Burke could expect the PIAA's written decision.   (*See*, email correspondence, attached hereto as **Exhibit 14**).

98.   Thereafter, on September 14, 2023, the PIAA issued its decisional letter regarding Coach Burke's appeal (the "Decisional Letter").   A true and correct copy of the Decisional Letter is attached hereto as **Exhibit 15**.

99.   The Decisional Letter confirmed the PIAA's decision as it had been previously relayed by Dr. Lombardi, upholding Coach Burke's one year suspension.

100.   Although the Decisional Letter readily admits that the PIAA's Board of Appeals is constrained to and can only review and consider the evidence, oral and written, as submitted at the District VII Board because a transcript was created, the PIAA's Board of Appeal's decision is clearly based on facts not in evidence, capricious disregard of the unrefuted evidence presented and/or misrepresentation of the actual evidence presented.   Moreover, the PIAA Board confirmed that it and the WPIAL wrongfully placed the burden of proof on Coach Burke and SSA.   "As in any other administrative hearing, the burden is on the complainant (here, Coach Burke) to make her arguments in full."   (*See*, **Ex. 15**, at pg. 5).

101.   The Decisional Letter found:   "[T]he specific message was directed from Coach Burke to Brian and Sarah Vierra, who recently 'followed' Coach Burke's Twitter page (NT, at p. 18-19), but who had not made any outreach to Coach Burke.   On her own accord, Coach Burke researched the Vierra's Twitter pages (a practice wholly and freely available to subscribers), saw

that the Vierras were 'basketball people' (NT, at pgs. 20, 33-34), and chose to initiate contact with them…"  This rendition of the facts is simply not part of any record evidence presented to the WPIAL Committee that the PIAA decision admitted it is constrained to follow.  Rather, the unrefuted evidence submitted to the WPIAL Committee was:  (1) the Vierras purposefully sought out Coach Burke on Twitter, amongst the millions of other Twitter users (*see*, **Ex. 7**, WHT Ex. 1; Pg. 18, Lines 5-25; Pg. 19, Lines 1-25; Pg. 20, Lines 1-3; Pg. 16, Lines 14-25; Pg. 17, Lines 1-10; and WHT Ex. 3-5); (2) the Vierras initiated an inquiry to Coach Burke by both independently contacting her through her own personal Twitter account (*see*, **Ex. 7**, WHT Ex. 1; Pg. 17, Lines 3-25; Pg. 18, Lines 1-25; Pg. 19, Lines 1-16; and WHT Ex. 5 and 6); (3) the Vierras provided and invited Coach Burke to review videos of their daughter playing basketball (*see*, **Ex. 7**, WHT Ex. 1; Pg. 40, Lines 20-25; Pg. 41, Lines 1-9); (4) Coach Burke received a notification icon on her Twitter page that two people previously unknown to her had notified her of their contact and she briefly responded to the Vierra's initial inquiry given their interest in Shady Side Academy (*see*, **Ex. 7**, WHT Ex. 1; Pg. 20, Lines 14-25; Pg. 21, Lines 12-25; Pg. 22, Lines 1-14); and (5) despite the opportunity, the Vierras' never contradicted Coach Burke's testimony to the Board or the accuracy of her version of events and there was no other reason offered by South Fayette, the Vierras, the WPIAL or the PIAA as to why the Vierras contacted Coach Burke other than to express an interest in Shady Side Academy.  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 20, Lines 14-24).

102.    The Decisional Letter readily admits and acknowledges that the unrefuted evidence submitted into the record demonstrates that Coach Burke believed that the Vierras' actions of searching for her on Twitter, both initiating contact with her through her Twitter and both providing her and inviting her to view videos of their daughter playing basketball, was an initiating

contact, yet decided without basis or record evidence that Coach Burke initiated contact with the Vierras with no evidence of record to support that conclusion.  (*See*, **Ex. 15**).

103.    The Decisional Letter confirmed that the PIAA was presented with independent evidence to substantiate that a Twitter follow as an "initial inquiry".  (*See*, **Ex. 7**, WHT Ex. 2 and 3).  The unrefuted evidence presented to the PIAA stated:  "A social media follower is a person who subscribes to the opinions, ideas, beliefs, and teachings of another.  On social media, followers alike, subscribe and follow accounts and pages in order to receive notifications and see the content those creators post on their news feeds.  It is useful to know that follows are not the same as likes or shares.  People actively engage by liking, sharing, or retweeting a post when they find value in that individual post, but a follow is much more than that.  It indicates that a user is interested in getting constant updates."  (*See*, **Ex. 7**, WHT Ex. 2).  Without any evidentiary support, the PIAA Board disregarded this evidence and instead adopted its own manufactured construction of the term.  Furthermore, the PIAA Board ignored the unrefuted evidence presented that it was the Vierras who initiated contact with Coach Burke, as she testified she did not know who they were.  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 17, Lines 11-25; Pg. 18, Lines 1-25; Pg. 19, Lines 1-16; Pg. 23, Lines 14-25; Pg. 24, Lines 1-5).

104.    The Decisional Letter found that Coach Burke's action of responding to the Vierras' initial inquiry via Twitter violated the PIAA recruiting rules while simultaneously admitting the PIAA does not have any rules regarding what constitutes as an initiating inquiry via social media.  "[S]ocial media concepts such as Twitter did not exist when the bulk of the PIAA recruiting rules were enacted."  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 59, Lines 2-9; *see*, *also*, **Ex. 15**).  Yet, the PIAA Board made no attempt to ensure its rules were appropriately applied to modern day technologies, including social media interaction.

105.    The PIAA further admitted in the Pittsburgh Post-Gazette on September 13, 2023,

that the PIAA does not have the very rule it accused Coach Burke of violating:

> "A few board members want the new rule to also address coaches from a private
> school or another public school contacting an athlete from another school through
> social media.  Shady Side Academy girls basketball coach Jonna Burke was
> recently suspended by the WPIAL and PIAA for a year for alleged recruiting.
> Burke sent a direct message to parents of a South Fayette athlete who followed her
> on Twitter.  In her message, Burke asked if there was any interest in attending
> Shady Side Academy.
>
> Bob Lombardi, executive director of the PIAA, said social media contacts should
> be part of any new rule concerning illegal recruiting.  Currently, PIAA rules do not
> address social media issues.
>
> 'Social media is a real presence in the real world and needs to be addressed,'
> Lombardi said."  (*See*, Pittsburgh Post-Gazette article, attached hereto as **Exhibit
> 16**).

Despite admitting it does not have a rule that governs and defines what an initiating inquiry

is via social media, for purposes of determining whether an act is recruiting or not, the PIAA

Decisional Letter found that Coach Burke violated a rule that is non-existent.

106.    The Decisional Letter found that "Coach Burke was quite clear that her intent was

to contact the Vierras for a purpose related to basketball; thus, her material motivation in making

the initial outreach was an athletic purpose, a clear violation of PIAA's Recruiting rules." (*See*,

**Ex. 15**).  The PIAA's finding is in direct and utter conflict the evidence presented to the Board.

The unrefuted evidence submitted to the Board was (1) Coach Burke's intent was not to recruit

(*see*, **Ex. 7**, WHT Ex. 1; Pg. 28, Lines 12-18); (2) Coach Burke did not initiate contact with the

Vierras, rather, the Vierras initiated contact with her (*see*, **Ex. 7**, WHT Ex. 1; Pg. 18, Lines 1-12;

Pg. 19, Lines 13-16; Pg. 23, Lines 11-25; Pg. 24, Lines 1-5; Pg. 25, Lines 18-21; Pg. 40, Lines 20-

25; Pg. 41, Lines 1-9); and (3) Coach Burke's response to the Vierras is void of any material

motivation with athletic purpose because Coach Burke did not know who the Vierras or their

daughter was and "but for" them contacting her first, she would not have had any contact with them (*see*, **Ex. 7**, WHT Ex. 1; Pg. 40, Lines 20-25; Pg. 41, Lines 1-9).

107.    The Decisional Letter also confirmed that the PIAA Policies and Procedures were violated by: (1) the failure to provide SSA and Coach Burke with a copy of the Complaint; (2) the failure to allow Coach Burke to hear the evidence against her prior to presentation of her own case; (3) the failure to provide SSA and Coach Burke with timely notice of the WPIAL Hearing date; and (4) shifted the burden of proof on to Coach Burke and SSA when the Pennsylvania School Code governing Interscholastic Athletics Accountability squarely puts the burden on the association and complaining school (24 P.S. §16-1604-A(b)(12)(ii)).

108.    Although the Decisional Letter found that there were violations of the PIAA mandatory Policies and Procedures before and during Coach Burke's Hearing, it ignored the record and necessarily stated without basis that Coach Burke failed to point out how this materially impacted her presentation at the District Board level or her arguments at her Board of Appeal. This finding is clearly erroneous and contrary to the unrefuted evidence presented.  SSA/Coach Burke advised the WPIAL Committee that failure to follow its rules and not require South Fayette to go first, Coach Burke could not and was deprived of her ability to confront her accusers and violative of her constitutional rights.  (*See*, **Ex. 7**, WHT Ex. 1; Pg. 9, Lines 12-25; Pg. 10, Lines 1-25; Pg. 11, Line 25; Pg. 12, Lines 1-25).  Moreover, the PIAA received and represented that it read SSA/Coach Burke's August 3, 2023 letter of Appeal of the July 21, 2023 Hearing Decision of the WPIAL Committee, which contained the WPIAL Hearing Transcript (*see*, Appeal Letter, at **Ex. 7**), wherein the specific ways in which SSA/Coach Burke's presentation was materially impacted:

- SSA/Coach Burke was unable to hear and respond to South Fayette's allegations (**Ex. 7**, pg. 24-27);

- The WPIAL Committee and the PIAA in not requiring South Fayette to present its case first as mandated, ignored South Fayette's burden of proof and wrongfully placed the burden of proof on Coach Burke along with the added weight of denying her a copy of the Complaint against her or the ability to cross-examine witnesses or to dispute unknown evidence never offered or presented (**Ex. 7**, pg. 24-27);

- SSA/Coach Burke was unable to cross-examine witnesses and test the credibility, veracity basis and motivation for the allegations (**Ex. 7**, pg. 24-27);

- Without benefit of hearing evidence against her, she was unable to determine if South Fayette's Complaint was based upon its inaccurate belief that Coach Burke sought out, selected and initiated contact with the Vierra parents (**Ex. 7**, pg. 24-27);

- Without benefit of hearing South Fayette's evidence, SSA/Coach Burke could not examine whether the Complaint relied on misinformation in believing that Coach Burke sought out and initiated contact with the Vierras first (**Ex. 7**, pg. 24-27); and

- Without benefit of South Fayette identifying prior contacts the voting board members had with the two recused board members regarding the Complaint, SSA/Coach Burke unable to challenge the impartiality of the remaining members (**Ex. 7**, pg. 27-32).

(*See*, *also*, **Ex. 7**, WHT Ex. 1; Pg. 1, Lines 21-25; Pg. 2, Lines 1-25; Pg. 3, Lines 1-2; Pg. 6, Lines 13-25; Pg. 7, Lines 1-25; Pg. 8, Lines 1-25).

109.    The Decisional Letter by rule is limited to the transcript and written evidence presented to the WPIAL Committee.  Yet, the Decisional Letter disregards all of the evidence of record and relies on evidence not of record and a mischaracterization of evidence in order to sustain the WPIAL Committee's decision.  *See*, **Ex. 15**.  As a result, Coach Burke was suspended from coaching for any athletic teams for one (1) year, effective June 12, 2023.

I.    **PIAA's Unconstitutional and Arbitrary and Capricious Conduct**

110.    The sanctions imposed by the PIAA constitute an effective one (1) year termination of Coach Burke in her position as the head coach of SSA's Highschool Girls' Basketball program. The sanctions will prevent her participation in the 2023-2024 season.

111.    The sanctions are premised on allegations and facts that were unknown to Coach Burke and SSA.  These facts and allegations could not have been and were not anticipated by Coach Burke and SSA.

112.    The sanctions are premised on facts not submitted into evidence.

113.    The sanctions are premised on the omission or callous disregard of unrefuted evidence and wrongfully placing the burden of proof on the accused.

114.    The PIAA's sanctions against Coach Burke and SSA have been widely publicized. Accordingly, Plaintiff's reputation in the high school athletic community has been gravely harmed.

115.    Coach Burke will be precluded from coaching the members of the 2023-2024 girls' basketball team, most of whom she has spent significant time and investment to develop meaningful coach/student relationships.

116.    As a result of the wrongfully imposed PIAA sanctions, Plaintiff has experienced embarrassment, humiliation, mental anguish, pain, and suffering.

## COUNT I

### 42 U.S.C. § 1983 – Violation of the Due Process Clause of the 14th Amendment to the United States Constitution – Deprivation of Full and Fair Hearing

**Coach Burke & SSA v. PIAA**

117.    Plaintiffs incorporate the averments made in all of the aforementioned paragraphs as if set forth more fully herein.

118.    The PIAA is a state actor acting under the color of state law.

119.    Under 42 U.S.C. § 1983, the PIAA is liable to Plaintiffs for violation of their rights under the United States Constitution.

120.    Coach Burke maintains a protectable property interest in her continued public employment as the coach of SSA's Highschool Girls' Basketball program.

121.    Coach Burke maintains a protectable property interest in her good name, reputation, honor and integrity as the coach of SSA's Highschool Girls' Basketball program.

122.    SSA maintains a protectable property interest in its right to operate free from undue and/or arbitrary interference, including through its own selection, retention, and management of its coaching staff for SSA's Highschool Girls' Basketball program.

123.    Plaintiffs' property interests entitle them to procedural and substantive due process under the law.

124.    Due process under the 14th Amendment of the United States Constitution requires adequate notice and hearing.

125.    The PIAA's conduct and sanctions deprived, interfered with and/or infringed upon Plaintiffs' due process rights to a full, fair, and impartial under the 14th Amendment to the United States Constitution.

126.    The PIAA's sanctions constitute a continuing violation of Plaintiffs' due process rights to a full, fair, and impartial hearing.

127.    The PIAA's conduct surrounding the sanctions imposed upon Plaintiffs amounts to an abuse of its official power that shocks the conscience.

128.    Defendant has deprived Coach Burke of her liberty and property interests and deprived SSA of its property interests, each without due process of law through a full, fair, and impartial hearing by the following conduct:

a.    in violation of Defendant's own published procedures and rules, failing to provide Plaintiffs with a copy of the "filed" Complaint by South Fayette Athletic Director, Mark Keener, prior to the WPIAL Committee Hearing on July 20, 2023;

b.    in violation of Defendant's own published procedures and rules, failing to provide timely notice to Plaintiffs of the July 20, 2023 hearing date;

c.    in violation of Defendant's own published procedures and rules, failing to require the complaining school, South Fayette, to present any and all allegations and evidence against Coach Burke that supported South Fayette's contention that Coach Burke engaged in "recruiting" in violation of PIAA Constitution and Bylaws Article VI, Section 9;

d.    in violation of Defendant's own published procedures and rules, requiring Plaintiffs to present their defense without first being permitted to hear the allegations and evidence against them and confront their accusers;

e.    imposing sanctions without first allowing Plaintiffs the opportunity to hear the allegations raised against Coach Burke;

f.    imposing sanctions without allowing Plaintiffs to confront and cross-examine their accusers based upon their allegations;

g.    in violation of Defendant's own published procedures and rules, failing to identify the WPIAL conflicts of interests within the voting Committee members due to their contact with recused board members Brian Geyer and Jason Olexa, who each had contact with the complaining school, South Fayette, either before or after South Fayette "filed" its Complaint with the WPIAL Executive Director, Scott Seltzer (*see*, **Ex. 7**, WHT Exhibits 1 and 2);

h.    permitting WPIAL Committee members, who had apparent or seemingly apparent conflict of interests, to participate in the hearing against Plaintiffs

and to impose sanctions against Plaintiffs (*see*, **Ex. 7**, WHT Exhibits 1 and 2);

i.    imposing sanctions on Plaintiffs that were contrary to the record evidence presented in the WPIAL hearing, in violation of Defendant's own published procedures and rules;

j.    imposing sanctions upon Plaintiffs that were unsupported by substantial evidence in the record and/or were based upon observations made outside of the hearing process;

k.    failing to consider unrebutted, credible evidence offered by Plaintiffs regarding Coach Burke's response to an initial inquiry;

l.    promulgating and engaging in procedures that permitted the PIAA to affirm the WPIAL Committee's decision despite procedural defects and violations of its own published rules;

m.    in violation of Defendant's own published procedures and rules, PIAA failing to constrain its decision to only the transcribed testimony and written evidence submitted during the WPIAL Hearing;

n.    in failing to make South Fayette meet its burden of proof;

o.    in finding without evidence submitted that South Fayette met its burden of proof;

p.    in wrongfully placing the burden of proof on Coach Burke/SSA; and

q.    PIAA failed to meet its burden of proof pursuant to 24 P.S. §16-1604-A(b)(12)(ii).

129.    The foregoing due process violations constitute a continuing deprivation of Coach Burke's right to continued employment as the SSA Girls' Basketball head coach.

130.    The foregoing due process violations constitute a continuing deprivation of Coach Burke's right to protect her reputation and integrity.

131.    The foregoing due process violations constitute a continuing deprivation of SSA's right to operate free from undue and/or arbitrary interference.

132.    Such deprivation of rights continues while the PIAA sanctions remain in place.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court issue a Preliminary Injunction and thereafter issue a Permanent Injunction enjoining Defendant from imposing and/or enforcing any and all sanctions issued by the WPIAL Committee and the PIAA Board of Appeal directly against Plaintiffs and enter judgment in favor of Plaintiffs and against Defendant and award Plaintiffs damages for lost earnings, compensation for her embarrassment, humiliation, mental anguish, impairment of reputation, pain and suffering plus interest, costs, reasonable attorney's fees, as well as all other relief the Court deems appropriate.

## COUNT II

### 42 U.S.C. § 1983 – Violation of the Due Process Clause of the 14th Amendment to the United States Constitution – Deprivation of Adequate Notice

### Coach Burke & SSA v. PIAA

133.    Plaintiffs incorporate the averments made in all of the aforementioned paragraphs as if set forth more fully herein.

134.    The PIAA is a state actor acting under the color of state law.

135.    Under 42 U.S.C. § 1983, the PIAA is liable to Plaintiffs for violation of their rights under the United States Constitution.

136.    Coach Burke maintains a protectable property interest in her continued public employment as the coach of SSA's Highschool Girls' Basketball program.

137.    Coach Burke maintains a protectable property interest in her good name, reputation, honor and integrity as the coach of SSA's Highschool Girls' Basketball program.

138.    SSA maintains a protectable property interest in its right to operate free from undue and/or arbitrary interference, including through its own selection, retention, and management of its coaching staff for SSA's Highschool Girls' Basketball program.

139.    Plaintiffs' property interests entitle them to procedural and substantive due process under the law.

140.    Due process under the 14th Amendment of the United States Constitution requires adequate notice and hearing.

141.    The PIAA's conduct and sanctions deprived, interfered with and/or infringed upon Plaintiffs' due process rights to receive adequate notice under the 14th Amendment to the United States Constitution.

142.    The PIAA's sanctions constitute a continuing violation of Plaintiffs' due process rights to receive adequate notice prior to deprivation of their rights.

143.    The PIAA's conduct surrounding the sanctions imposed upon Plaintiffs amounts to an abuse of its official power that shocks the conscience.

144.    Defendant has deprived Coach Burke of her liberty and property interests and deprived SSA of its property interests, each without due process of law through adequate notice by the following conduct:

a.　　finding that Coach Burke violated PIAA Constitution and Bylaws Article VI, Section 9 by failing to apply the plain meaning of the term "seek out" as it relates to the definition of "recruiting";

b.　　finding that Coach Burke's actions did not fall within the PIAA recruiting rule exception found in PIAA Constitution and Bylaws Article VI, Section 9(9) wherein a coach is permitted to "respond" to student and family "initiated inquiries";

c.　　finding that Coach Burke's actions did not fall within the PIAA recruiting rule exception found in PIAA Constitution and Bylaws Article VI, Section 9(9) by failing to apply the plain meaning of the term "initiate";

d.　　finding that Coach Burke's actions did not fall within the PIAA recruiting rule exception found in PIAA Constitution and Bylaws Article VI, Section 9(9) by failing to apply the plain meaning of the term "respond"; and

e.　　imposing sanctions based upon vaguely constructed and undefined rules regarding an "initiated inquiry".

145.　　The PIAA's rules are unconstitutionally vague such that Plaintiffs were without adequate notice or fair warning to understand the prohibited conduct prior to the PIAA's imposition of sanctions.

146.　　The PIAA's rules are unconstitutionally vague as in this instance it impermissibly delegated broad discretion to decision makers to apply rules in an arbitrary and capricious manner.

147.　　The PIAA's rules are unconstitutionally vague as it placed the burden of proof by rule on the complainant, South Fayette, but the WPIAL Committee applied the rules in an arbitrary

and capricious manner by disregarding that requirement and wrongfully placing the burden of proof on the accused, Coach Burke.

148.    The PIAA's enforcement and application of its rules render them unconstitutionally vague and ambiguous, thereby infringing upon Plaintiffs' ability to discern what actions constitute prohibited "recruiting" pursuant to PIAA rules.

149.    The foregoing due process violations constitute a continuing deprivation of Coach Burke's right to continued employment as the SSA Girls' Basketball head coach.

150.    The foregoing due process violations constitute a continuing deprivation of Coach Burke's right to protect her reputation and integrity.

151.    The foregoing due process violations constitute a continuing deprivation of SSA's right to operate free from undue and/or arbitrary interference.

152.    Such deprivation of rights continues while the PIAA sanctions remain in place.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court issue a Preliminary Injunction and thereafter issue a Permanent Injunction enjoining Defendant from imposing and/or enforcing any and all sanctions issued by the WPIAL Committee and the PIAA Board of Appeal directly against Plaintiffs and enter judgment in favor of Plaintiffs and against Defendant and award Plaintiffs damages for lost earnings, compensation for her embarrassment, humiliation, mental anguish, impairment of reputation, pain and suffering plus interest, costs, reasonable attorney's fees, as well as all other relief the Court deems appropriate.

## COUNT III

### 42 U.S.C. § 1983 – Violation of the Equal Protection Clause of the 14th Amendment to the United States Constitution – Disparate Treatment

### Coach Burke & SSA v. PIAA

153.    Plaintiffs incorporate the averments made in all of the aforementioned paragraphs as if set forth more fully herein.

154.    The PIAA is a state actor acting under the color of state law.

155.    The PIAA's conduct and sanctions deprived, interfered with and/or infringed upon Plaintiffs' rights under the United States Constitution, including the Equal Protection Clause of the Fourteenth Amendment.

156.    Under 42 U.S.C. § 1983, the PIAA is liable to Plaintiffs for violation of their rights under the United States Constitution.

157.    The PIAA's conduct imposed sanctions upon Plaintiffs in a manner differently from similarly situated persons.

158.    The PIAA's actions and sanctions imposed denied, interfered with and/or infringed upon Plaintiffs' constitutional rights to equal protection under the laws, in that, the PIAA's recruiting violation determination unfairly discriminated against Coach Burke: 1) in finding that her actions of responding to the Vierras' inquiry was an attempt to "seek out" a student athlete; 2) that the Vierra parents' actions of searching and finding Coach Burke's personal Twitter page and ultimately initiating contact with Coach Burke did not constitute an "initiating inquiry" contrary to the plain meaning of the words; and 3) finding that Coach Burke's response to the Vierra parents' initial inquiry was not a "response" contrary to the plain meaning of the word.

159.    The unfair discrimination by PIAA with regard to Coach Burke's recruiting violation determination and suspension infringed upon the fundamental rights of Coach Burke,

namely her right to a fair, full and impartial hearing with proper notice given under the United States Constitution and the Pennsylvania Constitution.

160.    The PIAA actions and ruling unfairly discriminated against Plaintiffs by failing to equally and fairly applying the plain meaning of the words of the recruiting rules to all actions like all other coaches and/or schools in their positions.

161.    The PIAA actions and ruling unfairly discriminated against Coach Burke and SSA as compared to other coaches and schools within the PIAA system in that the PIAA arbitrarily and intentionally applied the PIAA recruiting rules to Coach Burke's actions differently and unequally than it does to other similarly situated coaches and schools, which is not supported by or narrowly tailored to further or achieve a compelling justification or interest.

162.    The PIAA ruling and actions unfairly discriminate against Plaintiffs by unfairly and intentionally applying the recruiting rules in such a way as to render them vague and ambiguous infringing on Plaintiffs' abilities to have notice of exactly what actions would constitute recruiting, pursuant to the PIAA rules.

163.    The PIAA ruling and action of finding that Coach Burke violated the PIAA recruiting rules and its imposition of a one (1) year suspension is not rationally related to or supported by any legitimate interest or justification.

164.    PIAA is also liable to the Plaintiff for violation of her equal protection right under the Pennsylvania Constitution.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court issue a Preliminary Injunction and thereafter issue a Permanent Injunction enjoining Defendant from imposing and/or enforcing any and all sanctions issued by the WPIAL Committee and the PIAA Board of Appeal directly against Plaintiff and enter judgment in favor of Plaintiff and against

Defendant and award Plaintiff damages for lost earnings, compensation for her embarrassment, humiliation, mental anguish, impairment of reputation, pain and suffering plus interest, costs, reasonable attorney's fees, as well as all other relief the Court deems appropriate.

## COUNT IV

### Declaratory Judgment Under Pennsylvania Law – 42 Pa. C.S. § 7532
### PIAA's Actions and Rulings are Arbitrary and Capricious

### Coach Burke & SSA v. PIAA

165.    Plaintiffs incorporate the averments made in all of the aforementioned paragraphs as if set forth more fully herein.

166.    The PIAA ruling is arbitrary and capricious and constitutes an invasion of Plaintiffs' property and pecuniary rights on the part of the WPIAL/PIAA.

167.    The PIAA finding that Coach Burke's response to the Vierra parents' inquiry was a violation of the PIAA's recruiting rules is in direct conflict with and violates the PIAA's own rules.

168.    Article VI, Section 9 of the PIAA Constitution and Bylaws, titled, "Recruiting" provides in pertinent part:

> "Recruiting which is materially motivated in some way by an athletic purpose is defined as efforts by a school, or any of its employees, agents, or representatives, to engage in, support, or condone conduct whereby a motivating factor is to **seek out** one or more athletes to attend a particular school..." (emphasis added).

169.    Pursuant to the clear language of the PIAA Bylaws, Coach Burke's action of responding to the Vierra parents' initial contact with her via Twitter was not an act of "seeking out" an athlete pursuant to the plain meaning of the otherwise undefined term.

170.    Moreover, Article VI, Section 9 of the PIAA Constitution and Bylaws exception to its recruiting restrictions states:

"This restriction does not prohibit school personnel from responding to purely student - or student family - initiated inquiries to the personnel about athletic programs at the school."

171.    Pursuant to the plain language of the PIAA Bylaws, Coach Burke's action of responding to the Vierra parents' initial contact with her through Twitter is an exception to the recruiting rule as written.

172.    In Article VI, Section 9 of the PIAA Constitution and Bylaws, an "initiated inquiry" is undefined by and thus in applying the plain meaning of the term "initiated", the Vierra parents' actions of individually, intentionally and deliberately contacting Coach Burke by way of Twitter qualifies as an initiating inquiry to which Coach Burke was permitted to respond.

173.    In Article VI, Section 9 of the PIAA Constitution and Bylaws, the term "responding" is not defined, and thus applying the plain meaning of the term "responding", Coach Burke's action of responding to the Vierra parents' initial contact with her via Twitter qualifies as a "response" which is permitted by the PIAA Bylaws.

174.    The PIAA's suspension is in direct violation of its own Bylaws and is arbitrary and capricious and an invasion of Plaintiffs' property and pecuniary rights.

175.    Further, Section V(D) of the PIAA Policies and Procedures, Procedural Standards, requires in pertinent part:

"Where the matter arises on the written complaint of member school, the notice letter to the accused school shall include a copy of the written complaint…"  (*See*, **Ex. 6**, Procedural Standards, V(D), at pg. 21).

176.    The PIAA failed to timely provide to SSA and/or Coach Burke a copy of the written Complaint made against Coach Burke.  The WPIAL/PIAA, in violation of its own rules, never

provided SSA and/or Coach Burke with a copy of the written Complaint until minutes before the WPIAL Hearing.

177.    Section V(C) of the PIAA Policies and Procedures, Procedural Standards for Hearings, provides that at least two (2) weeks' notice prior to a hearing date.  WPIAL/PIAA failed to follow its own rules by providing SSA and Coach Burke less than the required fourteen (14) days' notice of the Hearing Date.

178.    Section E(3) of the PIAA Policies and Procedures, Procedural Standards for Hearings, states in pertinent part the PIAA's mandatory obligations as it relates to hearings:

> "Where the matter involves a complaint of athletic recruiting, the complaining school or party **shall** make the first presentation."  (emphasis added).  (*See*, **Ex. 6**, Procedural Standards for Hearings, E(3), at pg. 23).

> Similarly, Section VI(F) of the PIAA Policies and Procedures provides:

> "The evidentiary portion of the hearing **shall** begin with the presiding officer calling upon the applicable Principal or the Principal's designee to present the matter."  (emphasis added).  (*See*, **Ex. 6**, Procedural Standards for Hearings, VI(F), at pg. 24).

179.    Pursuant to the clear language of the PIAA Policies and Procedures, the complaining school, South Fayette, was required to present its case against Coach Burke with all of its evidence indicative of the fact that the party going first carries the burden of proof.  However, South Fayette never made an evidentiary presentation.  In fact, South Fayette's representative never spoke and submitted no evidence at the WPIAL Hearing.

180.    Still further, 24 P.S. §16-1604-A(b)(12)(ii) provides that the burden of proof in demonstrating a breach of its rules is on the PIAA, not Coach Burke or SSA and that the PIAA is required to afford Coach Burke/SSA due process rights in defending itself against allegations of a violation of any of its rules prior to imposing penalties.

181.    The PIAA wrongly placed the burden of proof on Coach Burke and SSA or wrongfully found South Fayette met the burden without the evidence submitted into the record or by the "impartial" Committee receiving evidence outside of the record before the Hearing.

182.    The PIAA actions of deliberately and intentionally not following their own rules, policies and procedures, is arbitrary and capricious and a complete disregard of Coach Burke's due process rights.

183.    The PIAA ruling that Coach Burke violated the PIAA recruiting rules and the imposed one (1) year suspension is arbitrary and capricious and an invasion of Plaintiffs' property and pecuniary rights for the following reasons:

    a.    It is based on the WPIAL/PIAA finding that the Vierra parents' contact was not an "initial inquiry" when the WPIAL Committee was not presented with any evidence to support that finding;

    b.    It is based on the WPIAL/PIAA finding that Coach Burke "sought out" an athlete when all of the unrefuted evidence presented to the WPIAL Committee demonstrated that Coach Burke could not have "sought out" the Vierra daughter as the recruiting definition requires because Coach Burke did not know who the Vierra family was until they contacted her;

    c.    It is based on the finding that the Vierra parents seeking out Coach Burke's personal Twitter page, each contacting her separately via Twitter, altering Coach Burke of their contact and making available for Coach Burke to view videos of their daughter playing basketball did not rise to the level of initial inquiry when the PIAA recruiting rules fail to define the term and the

WPIAL Committee failed to apply the plain and common meaning to the term in order to reach its decision to suspend Coach Burke;

d.   It is based on the WPIAL Committee ignoring and failing to apply the plain and common meaning of the words "respond" or "responding";

e.   It is based on the WPIAL Committee applying rules in an arbitrary and discriminatory manner; and

f.   It is not based on any evidence presented to the WPIAL Committee and is contrary to all of the evidence submitted to it, which by PIAA Policies and Procedures is the only evidence upon which its decision can be based.

WHEREFORE, pursuant to the Declaratory Judgments Act, 42 Pa. C.S. § 7532, *et seq*., Plaintiffs respectfully demand judgment in their favor and against the Defendant as follows:

I.   For a decree declaring and adjudging the PIAA's conduct, ruling, and sanctions against Coach Burke and SSA as arbitrary and capricious, thereby voiding all actions of the PIAA;

II.   For a decree to permanently enjoin the PIAA's sanctions issued against Coach Burke and SSA; and

III.   For such other relief as the Court may deem just and proper, including attorney fees and costs.

### COUNT V
### Preliminary and Permanent Injunctive Relief

### Coach Burke & SSA v. PIAA

184.   Plaintiffs incorporate the averments made in all of the aforementioned paragraphs as if set forth more fully herein.

185.   If the PIAA's conduct and sanctions are permitted to stand, Plaintiffs have suffered and will continue to suffer immediate, significant, and irreparable harm that cannot be adequately compensated by monetary damages.

186.    Plaintiffs have and will continue to suffer immediate, significant and irreparable harm if the PIAA's conduct and sanctions are permitted to stand as they violate 24 P.S. §16-1604-A(b)(12)(ii), provides that the PIAA has the burden of proof, not Coach Burke or SSA, and the PIAA must afford Coach Burke and SSA due process rights including hearing the charges against her and to be able to defend herself against allegations.  The PIAA's violation of this statute is per se irreparable harm.

187.    Injunctive relief is necessary to prevent immediate and irreparable harm, namely the deprivation of constitutional rights, loss of interpersonal investments, reputational harm, mental anguish, lost coach/student relationships, and opportunity losses.

188.    If the PIAA's sanctions are not immediately halted such that Coach Burke is precluded from coaching through the 2023-2024 season, it will prove impossible to compensate Plaintiffs for their requested relief.

189.    Plaintiffs have no adequate remedy at law to protect their rights such that restraint by injunction is necessary to afford adequate relief.

190.    Greater injury will occur from refusing to grant this injunction than from granting it.  If the injunction is not granted, the 2023-2024 basketball season will move forward without Coach Burke's participation leaving SSA team members without her guidance and mentorship.  After the season concludes, Plaintiffs will be rendered without redress for these injuries.

191.    The injunction will restore the parties to the status quo as it existed before the PIAA acted in violation of the law.

192.    Plaintiffs are likely to prevail on the merits and have presented meritorious claims as the PIAA's actions and sanctions are both unconstitutional and constitute arbitrary and capricious conduct, rendering those actions void and unenforceable.

193.    The public interest would be served by granting this injunction as it will protect against the PIAA's constitutional violations and abuses of power, thereby giving greater integrity to the systems that govern student athletics throughout the Commonwealth of Pennsylvania.

194.    By virtue of the foregoing, Plaintiffs have demonstrated a likelihood of success on the merits and a balance of the equities that favors issuance of preliminary and permanent injunctions against the PIAA to stay the imposition of any sanctions against Coach Burke.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment in favor of Plaintiffs and against Defendant by entering a Preliminary Injunction and thereafter a Permanent Injunction enjoining the PIAA's imposition of sanctions against Coach Burke and SSA.

Dated:  September 26, 2023                     Respectfully Submitted,

                                              SMITH BUTZ, LLC


                                              /s/ Kendra L. Smith, Esq.
                                              Kendra L. Smith, Esq.
                                              Pa. I.D. 77217
                                              125 Technology Drive, Suite 202
                                              Bailey Center I, Southpointe
                                              Canonsburg, PA 15317
                                              (724) 745-5121